(C. D. 999)

ASBESTOS, LTD., INC. v. UNITED STATES

United States Customs Court, Second Division

(Decided April 17, 1946)

*Puckhafer, Rode & Rode* (*Howard C. Carter* of counsel) for the plaintiff.

*Paul P. Rao*, Assistant Attorney General (*Richard H. Welsh*, special attorney), for the defendant.

Before TILSON, KINCHELOE, and LAWRENCE, Judges

LAWRENCE, Judge: This case presents the question of the tariff status of certain machines, invoiced herein as "Disintegrators," which are used solely for breaking rock containing asbestos fibers. Duty was levied thereon at the rate of 27½ per centum ad valorem under the provision in paragraph 372 of the Tariff Act of 1930 for "all other machines * * * not specially provided for." They are claimed to be properly dutiable at the rate of 20 per centum ad

valorem, which is the modified rate specified in the trade agreement between the United States and the United Kingdom, effective January 1, 1939, 74 Treas. Dec. 253, T. D. 49753, as applicable to—

Textile machinery, finished or unfinished, not specially provided for, for textile manufacturing or processing prior to the making of fabrics or woven, knit, crocheted, or felt articles not made from fabrics (except worsted combs, bleaching, printing, dyeing, or finishing machinery, and machinery for making synthetic textile filaments, bands, strips, or sheets).

The only witness called herein was the president of the plaintiff corporation. He testified concerning the nature and character of the imported machines, which are depicted in the photograph in evidence as plaintiff's illustrative exhibit A. It is a device, he stated, that has "a metal casing to which there is a fast revolving shaft connected to the beaters—impact beaters." Asbestos rock, fed into the mechanism, is broken by impact, thus facilitating the subsequent removal therefrom, by another and different machine, of the asbestos fibers contained therein. We quote the witness:

The theory of extracting asbestos out of the rock is to give the rock the greatest possible impact to release the fibers. The greater the length of fiber the greater the value. And, therefore, in these impact machines we aim to maintain the greatest length of fiber. After these impact machines hit the rock the resultant product is then deposited on an oscillating screen and by air extraction we separate the fiber from the rock.

The evidence clearly establishes that the sole function of these so-called disintegrators is to break asbestos rock by impact, leaving to other machines, not in this importation, the removal of the asbestos fibers that have become separated from the broken rock. This removal of the fibers is accomplished by an oscillating screen and an air-suction device. As stated by the witness, the disintegrator "does no separation of its own."

On cross-examination, the witness was asked this question:

The asbestos fiber which is separated from the rock in Illustrative Exhibit A is by suction deposited in various bins throughout your plant, is it not?

and he replied: "As a separate operation not connected with the impact machine."

There was considerable testimony evidently designed to show the treatment to which the separated fibers were subjected after their release from the rock. While these facts are interesting, they have little or no evidentiary value in determining the tariff status of the imported machines.

Nor do we deem it necessary, in view of our conclusion in the premises, to discuss the contentions of plaintiff based upon uses made of the fibers and the quantity thereof which ultimately may be converted into textile material as distinguished from those used in making nontextile articles.

In support of its contention that these disintegrators are textile machinery, plaintiff seems to rely upon our decision in *T. D. Downing Co.* v. *United States*, 8 Cust. Ct. 407, C. D. 647. In its brief filed herein, plaintiff expresses its view as to the effect herein ,of the cited case as follows:

Until January 1, 1939, the effective date of the Trade Agreement with the United Kingdom, it is probable that the law as interpreted by judicial decision was that the instant merchandise is not textile machinery. However, on January 1, 1939 the law was changed by the Congress acting through the authority conferred upon the President of the United States. The bare provision for "all other textile machinery, finished or unfinished, not specially provided for" was changed to read "Textile machinery, finished or unfinished, not specially provided for, for textile manufacturing or processing prior to the making of fabrics or woven, knit, crocheted or felt articles not made from fabrics (except * * * )". This new language enlarged the provision for textile machinery in at least two important respects. It enlarged the term "textile machinery" to include machinery used for (1) *textile manufacturing and processing prior to the making of fabrics* and (2) *textile manufacturing and processing prior to the making of woven, knit, crocheted or felt articles.* Thus far, the court has had occasion to pass on both phases of this change only in the case of *T. D. Downing Co.* v. *United States*, 8 Cust. Ct. 407, C. D. 647, wherein a depitching machine, a carbonizing machine and a beater used to process raw grease wool prior to the carding operation in the manufacture of wool felt hats were held properly dutiable as textile machinery for textile manufacturing or processing prior to the making of felt articles. The court specifically held that the language used in this provision of the Trade Agreement with the United Kingdom modifies the rule of law previously in force. Thus, machines such as the disintegrators in suit are textile machines if they separate a textile material from its containing material. * * * [Italics quoted.]

The mere recital of the functions of the machines involved in the *Downing* case, *supra*, is sufficient to show that that case is here readily distinguishable. Each of the devices there named processed wool, which is unquestionably a textile material, whereas the sole function of the imported disintegrators is to break asbestos rock. To characterize such rock-breaking operation as "textile manufacturing or processing" would certainly require an extravagant stretch of the imagination. It would be just as logical similarly to describe the shearing of sheep or the ginning of cotton, because those processes also separate or remove from its place as found in nature a textile material which ultimately may be converted into a textile article. But it does not follow that the shearing and ginning operations in and of themselves assume the proportions of "textile manufacturing or processing" the wool and cotton. Indeed, sheep shearing has been held to be an agricultural pursuit. As observed by our appellate tribunal in *United States* v. *Irwin & Co.*, 7 Ct. Cust. Appls. 360, T. D. 36906:

The court may well take judicial notice of that which is known by all men, that the sheep which is raised by the American agriculturist furnishes for man not only food but raiment. The sheep industry is a well-known one allied with and

commonly conducted with the other agricultural pursuits. These importations are used in the production of man's raiment. It would seem, therefore, that sheep shears are instruments which may well be included within the term "agricultural implements" as used by Congress in the paragraph quoted.

What constitutes "textile machinery" has been judicially determined in a long line of decisions beginning with the case of *Whitlock Cordage Co.* v. *United States*, 13 Ct. Cust. Appls. 656, T. D. 41490. That case arose under the Tariff Act of 1922, in which the provision for "textile machinery" appeared for the first time. One of the questions there presented was: Did the provision cover rope-making machinery? Answering that inquiry the appellate court said:

> The "breaker card," the "third and finishing drawing frame," and the "regulating gill spinning frame" are used in the manufacture of yarn, which is a textile material, and, therefore, they, and the parts therefor, are included within the provision for all other textile machinery. The "24-spindle patented twister" is used in twisting the yarn into strands, and the strands into rope. Its function is to manufacture a textile material into a product which is not a textile, either within the strict definition of that term, or within the broader construction here placed upon the statute. Nor does it process or otherwise make textile materials available for textile uses. We are of opinion that such machinery is not textile machinery, and that it was not intended to be included within the provisions therefor.

Under that ruling, mechanisms which do not manufacture textile material, or process or otherwise make it available for textile uses, have been consistently denied tariff classification as textile machinery in subsequent litigation arising under the tariff acts of 1922 and 1930, the pertinent provisions being substantially the same in each act.

The most recent decision of our appellate court on the subject of textile machinery was rendered December 8, 1943, in *Brandon Corporation* v. *United States*, 31 C. C. P. A. (Customs) 149, C. A. D. 266. There, the court took occasion to say:

> At the time of entering into the trade agreement [with the United Kingdom], the negotiators thereof were, of course, aware of the fact that the term "textile machinery," as used in paragraph 372 of the Tariff Act of 1930, covered machinery used in the manufacture of textiles, such as textile fibers, filaments, yarns, and fabrics. * * *

citing *Whitlock Cordage Co.* v. *United States*, *supra*, and other decisions of that court on the subject.

As we read the provision in the trade agreement with the United Kingdom, *supra*, it does not extend the meaning of what constitutes textile manufacturing or processing beyond that which prevailed prior to January 1, 1939. It simply reduces from 40 to 20 per centum ad valorem the rate of duty imposed upon certain types of textile machinery which were already included in the general provision for such machinery in the Tariff Act of 1930. There is nothing in the language of the modifying provision to indicate that the trade negotiators in-

tended to reduce the rate of duty on machines which were not already provided for in the general provision for textile machinery. Obviously, the single purpose was to modify the statutory rate on the kind or class of textile machinery which is used "for textile manufacturing or processing prior to the making of fabrics," etc. But as a condition precedent to eligibility in that favored class, the machines must in the first analysis properly belong to the category of "textile machinery." Machines not of that class, like the present disintegrators or rock-breaking devices, are, in our opinion, not contemplated by the provision in the trade agreement, *supra*, nor by the unmodified statutory provision for textile machinery, and we so hold.

Upon the established facts and the law applicable thereto the protest of the plaintiff must be, and it hereby is, in all respects overruled and the decision of the collector is affirmed.

Judgment will be entered accordingly.